UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MARIO K. WOOD,

        Plaintiff,

        v.                                    Case No. 20-cv-1336-bhl

MARY BEHRENDT, et al.,

        Defendants.

## DECISION AND ORDER

Plaintiff Mario K. Wood, who is representing himself and serving a state prison sentence at the Green Bay Correctional Institution, is proceeding on allegations that his civil rights were violated while he was housed at the Milwaukee County Jail. Wood asserts claims under the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA) based on allegations that Defendants failed to provide congregate Islamic services while he was at the jail. Defendants filed a motion for summary judgment, which is fully briefed and ready for the Court's decision. Dkt. No. 20.

## BACKGROUND

Wood was an inmate at the jail for a little more than a year, from May 5, 2016 until June 21, 2017. He asserts that, during that time, the jail failed to facilitate congregate Islamic services (Jum'ah, Eid prayers, and Ta'lim) for Muslim inmates. Wood concedes that he did not attend any worship services, participate in Ta'lim, study with an Imam, or affiliate with any religious institution in the two years prior to being incarcerated at the jail. Further, he did not request a prayer rug while he was at the jail, and he currently does not engage in Ta'lim or Jum'ah services

or Eid prayer even though they are available to him at his current institution. Dkt. No. 9 at 2-4; Dkt. No. 48 at ¶¶14, 16, 23.

Defendant Mary Behrendt was a correctional officer during the relevant time, and she also served as the facilitator for religious programing. Defendants Aaron Dobson, Richard Schmidt, Brian Stadler, and Scott Sobek all worked at the jail, mostly in supervisory roles. They assert that they either were not aware of Wood's complaints about the lack of Islamic congregate services or they were not involved with or responsible for religious programming. Dkt. No. 21 at ¶1, 6, 8, 12, 16, 19, 21, 24.

At the relevant time, there were no paid religious leaders at the jail. Inmate requests for religious accommodations such as religious services were sent to Behrendt, who would direct the request to any available volunteer of the appropriate denomination. Behrendt explains that, if there were no volunteers available, she would make inquiries among the other volunteers, staff, and community organizations in an effort to find an appropriate volunteer. If she could not find a volunteer, the jail would not be able to offer the requested services. Dkt. No. 21 at ¶28, 41, 42, 43, 44.

From the 1990s until January 2015, Jamil Muslim, formerly known by the name of Harold Mason, Jr.,[1] volunteered his time to visit and pray with inmates at the jail. He did not provide congregate Islamic services such as Jum'ah, Ta'lim, or Eid prayer, but he asserts that, as a devout Muslim, he could have conducted modified Jum'ah services and led Eid celebrations and prayer appropriate to the confines of the jail setting. From 2013 until January 2015, another volunteer

---

[1] On September 24, 2021, Wood filed a motion to strike the declaration of Mr. Muslim. Dkt. No. 40. Wood noted that several of Defendants' proposed facts were supported by reference to "Muslim Decl." but Behrendt and all supporting documents from the jail refer to Mr. Mason, not Mr. Muslim. Defendants explain that Mr. Muslim changed his name from Harold Mason, Jr., to Jamil Abdul Malik Muslim in 1996. Thus, Mr. Muslim and Mr. Mason are the same person. Dkt. Nos. 50, 52. The Court will deny Wood's motion.

2

known as Mr. Henry also provided services to Muslim inmates similar to those provided by Mr. Muslim. Mr. Muslim provided transportation to the jail for Mr. Henry, so when Mr. Muslim paused his volunteer schedule in January 2015 to care for a sick relative, Mr. Henry also paused his volunteer schedule. Mr. Muslim resumed his volunteer schedule in 2017, after Wood had been transferred to another institution. Dkt. No. 21 at ¶¶45, 51-55; Dkt. No. 52 at ¶5; Dkt. No. 48 at ¶25.

Mr. Muslim asserts that Behrendt frequently asked him if he could recruit additional Muslim volunteers to provide services at the jail. He explains that he made attempts to recruit additional volunteers through his contacts in the Milwaukee area, but he was unsuccessful. Behrendt also telephoned and left messages at the Islamic Society on numerous occasions during the five years she was responsible for religious programming, but she never received a response. Dkt. No. 21 at ¶¶55, 57; Dkt. No. 51 at ¶4.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary

3

judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**ANALYSIS**

Wood asserts that Defendants violated his civil rights because they failed to facilitate congregate Islamic services. He argues that their efforts to locate a volunteer to lead services were inadequate and, if they could not find a volunteer, they should have paid someone to lead services. Defendants assert that the jail's reliance on volunteers to lead services and Behrendt's efforts to locate volunteers were constitutionally adequate. Defendants further assert that Wood's RLUIPA claim for injunctive relief is moot because he is no longer incarcerated at the jail.

As the Court explained in its screening order, "prisoners' rights to be afforded a reasonable opportunity to exercise their First Amendment rights must be balanced against the legitimate goals of the penal institution." *Hadi v. Horn*, 830 F.2d 779, 783 (7th Cir. 1987). The U.S. Supreme Court has explained that, under this standard, a regulation that impinges on a prisoner's constitutional rights is valid if it is reasonably related to legitimate penological interests. *Id.* at 784 (citing *Turner v. Safely*, 482 U.S. 78 (1987)). In analyzing this relationship, courts ask (1) whether there is a "valid, rational connection" between the restriction and a legitimate government interest; (2) whether the prisoner retains alternatives for exercising the right; (3) the impact that accommodation of the right will have on prison administration; and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on the right. *Turner*, 482 U.S. at 89-91.

Courts in this circuit have consistently concluded that the cancellation of religious services due to the absence of someone willing to lead them does not deprive a prisoner of his free exercise rights under the First Amendment. *Id.*; *see Givens v. Walker*, No. 07-2229, 2009 WL 3575379 at *7 (C.D. Ill. Oct. 23, 2009). As to the first factor, both security and economic concerns support the jail's policy requiring non-inmate volunteers. *See Mustafa Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991) (security and economic concerns are legitimate penological interests). Allowing an inmate to be in a position of authority over other inmates could jeopardize security, and conflicts could arise if an inmate lacked the religious knowledge to resolve issues that arose during a service. *See Hadi*, 830 F.2d at 784. Further, requiring the jail to pay for religious leaders as Wood suggests would undoubtedly place an additional burden the jail's budget.

As to the second factor, the record shows that Wood had alternative means of practicing Islam. He admits that he was permitted to participate in Ramadan and could have requested a prayer rug and Quran or could have consulted with other Muslims via telephone or visits, although it does not appear that he chose to do so. Dkt. No. 48 at ¶14; Dkt. No. 46 at ¶69. The third and fourth factors also weigh in favor of Defendants. As the Court already noted, requiring the jail to pay for religious leaders would burden the jail's budget and allowing inmates to lead services could give rise to security concerns. Further, Defendants have presented evidence that there was a shortage of available Muslim volunteers, demonstrating that there were no obvious, less restrictive alternatives the jail could have employed to protect its interest in safety and minimizing costs. Based on this record, no jury could reasonably conclude that the jail's policy requiring volunteers to lead congregate services infringed on Wood's right to free exercise.

In any event, Wood does not challenge the constitutionality of the policy itself. He makes no argument that the jail should have allowed him or other inmates to lead services. Instead, he

5

argues that Defendants' efforts to locate a volunteer were constitutionally insufficient. The Court finds that Defendants are entitled to qualified immunity on this claim. Qualified immunity shields government officials from civil liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it,' meaning that 'existing precedent . . . placed the statutory or constitutional question beyond debate.'" *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (alteration in original) (citations omitted). As such, an officer will be entitled to qualified immunity unless a plaintiff shows that "a general constitutional rule already identified in the decisional law . . . appl[ies] with obvious clarity to the specific conduct in question," *United States v. Lanier*, 520 U.S. 259, 271 (1997), so that "a reasonable person necessarily would have recognized it as a violation of the law," *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (citations omitted).

Behrendt explains that to find additional Muslim volunteers she frequently asked Mr. Muslim if he knew people willing to volunteer and she called the Islamic Society, but Mr. Muslim was unable to find volunteers and the Islamic Society never returned her calls. Wood asserts that Behrendt should have done more, going so far as to argue that the jail should have paid for a religious leader. But Wood identifies no cases holding that the Constitution imposes *any* burden on officials to locate volunteers or pay for religious leaders, let alone cases that would have put Defendants on notice that Behrendt's efforts were constitutionally insufficient. Because

6

Defendants could not have known from existing precedent that their efforts violated the law, they are entitled to qualified immunity.

Finally, Wood does not dispute Defendants' argument that his RLUIPA claim was rendered moot when he was transferred from the jail to a different institution. *See Thompson v. Bukowski*, 812 F. App'x 360, 364 (7th Cir. 2020). But even if he were to rely on the assertion in his complaint that he is likely to be held at the jail again, his claim would fail. RLUIPA prohibits prison officials from "impos[ing] a substantial burden on the religious exercise" of an inmate "unless the government demonstrates that imposition of the burden on that person . . . is the least restrictive means of furthering [a] compelling government interest." 42 U.S.C. §2000cc-1(a); *see also Grayson v. Schuler*, 66 F.3d 450, 451 (7th Cir. 2012). To prevail on a RLUIPA claim, the plaintiff has the initial burden to show that he has a sincere religious belief. *Holt v. Hobbs*, 574 U.S. 352, 360-61 (2015).

Defendants argue that Wood does not hold a sincere belief that participating in congregate services is a practice required by his faith. They highlight his concessions that, in the two years prior to his incarceration at the jail, he never attended any worship services, he did not participate in Ta'lim, and he was not affiliated with any religious institution. Further, Wood admits that he does not currently engage in Ta'lim or Jum'ah services or Eid prayer even though they are available to him at his current institution. Wood made no effort to rebut Defendants' evidence, *see* Fed. R. Civ. P. 56(e) ("the party opposing summary judgment to identify specific facts that establish a genuine issue for trial"), and no jury could reasonably conclude on these facts that Wood sincerely believes that participating in congregate services is a practice required by his faith. Accordingly, Defendants are entitled to summary judgment on Wood's RLUIPA claim.

7

## CONCLUSION

For these reasons, Defendants' motion for summary judgment (Dkt. No. 20) is **GRANTED** and Wood's motion to strike Mr. Muslim's declaration (Dkt. No. 40) is **DENIED**. The Court orders that this case is **DISMISSED** and that the Clerk of Court shall enter judgment accordingly.

**SO ORDERED** at Milwaukee, Wisconsin this 18th day of November, 2021.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

---

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.